# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-KA-01147-COA

SKYLAR O'KELLY A/K/A SKYLAR NOEL O'KELLY        APPELLANT

v.

STATE OF MISSISSIPPI        APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 08/05/2016 |
| TRIAL JUDGE: | HON. LEE J. HOWARD |
| COURT FROM WHICH APPEALED: | OKTIBBEHA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | RODNEY A. RAY |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LAURA HOGAN TEDDER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART; REMANDED - 08/30/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WILSON, J., FOR THE COURT:**

¶1. In August 2014, Skylar O'Kelly sold or gave his friend Parker Rodenbaugh two "hits" of 25B-NBOMe, a controlled substance referred to at trial as "synthetic LSD." A few hours later, Rodenbaugh died from the toxic effects of the drug. O'Kelly was indicted for trafficking in a controlled substance and depraved-heart murder. Following a jury trial in the Oktibbeha County Circuit Court, O'Kelly was convicted on both counts and sentenced to concurrent terms of ten years in the custody of the Mississippi Department of Corrections (MDOC) for trafficking and twenty years in MDOC custody for depraved-heart murder.

¶2.    On appeal, O'Kelly challenges the sufficiency and weight of the evidence on both counts and argues that the circuit court erred by denying his pretrial motion to suppress statements that he made to police. We affirm O'Kelly's conviction for drug trafficking, and we hold that the circuit did not err by denying O'Kelly's motion to suppress. However, we hold that the evidence introduced at trial was insufficient to support a conviction for either depraved-heart murder or the lesser-included offense of culpable-negligence manslaughter. Therefore, we reverse and render a judgment of acquittal on that count. We remand the case for resentencing on the conviction for trafficking in a controlled substance.

### FACTS AND PROCEDURAL HISTORY

¶3.    In July 2014, O'Kelly, then twenty-one years old, paid a former high school classmate $500 for approximately 450 dosage units or "hits" of 25B-NBOMe, a controlled substance[1] referred to at trial as "synthetic LSD." O'Kelly bought the drugs both for personal use and to sell to others for $10 per hit. O'Kelly claimed that he did not know that the drug was illegal, but he admitted that he had never heard of it being sold openly or in a store. O'Kelly further testified that he did not know that the drug was dangerous. After he bought the drugs, both O'Kelly and his younger brother Daylin, then nineteen years old, took hits on one or

---

[1] 25B-NBOMe and two similar compounds—25C-NBOMe and 25I-NBOMe—were made Schedule I controlled substances under federal law by order of the Drug Enforcement Administration (DEA) on November 15, 2013. *See* 78 Fed. Reg. 68,716 (Nov. 15, 2013). The three compounds were added to Schedule I of the Mississippi Uniform Controlled Substances Act effective April 17, 2014. *See* 2014 Miss. Laws ch. 501, §§ 1 & 3; Miss. Code Ann. § 41-29-113(c)(49)-(51) (Supp. 2017).

2

more occasions.

¶4.     O'Kelly moved to Starkville in August 2014. He testified that he planned to attend Mississippi State University, but he was not enrolled. On August 9, 2014, O'Kelly and Daylin were at O'Kelly's apartment in Starkville. Around 9 p.m., they went to a house where Parker Rodenbaugh, a twenty-two year old MSU student, lived with four other MSU students. O'Kelly and Rodenbaugh graduated from high school together, and O'Kelly testified that they were "best friends." O'Kelly testified that he, Daylin, and Rodenbaugh went downstairs, smoked marijuana and tobacco from a hookah pipe, and played video games. One of Rodenbaugh's roommates, Pierson Crowder, was hosting a fantasy football draft party upstairs with several guests. Two of Rodenbaugh's other roommates, Sam and David Kealhofer, were also present at different times during the night.

¶5.     O'Kelly testified that around 10 p.m. Rodenbaugh asked him if he "wanted to trip," referring to the NBOMe. O'Kelly testified that he and Rodenbaugh had taken NBOMe together previously. O'Kelly went back to his apartment, retrieved five hits of NBOMe, and then returned to Rodenbaugh's house. O'Kelly took two hits himself, gave one hit to Daylin, and gave two hits to Rodenbaugh. O'Kelly told police that Rodenbaugh agreed to pay $20 for the two hits later. Rodenbaugh told both Crowder and Sam Kealhofer that he had taken "acid" or "LSD." They were not shocked or surprised, as they knew that Rodenbaugh had taken acid before. Nor were they concerned, as Rodenbaugh seemed fine at that time.

¶6.     Forty-five minutes to an hour later, Rodenbaugh "began to repeat himself"—saying

3

"good vibes" over and over—and saying things that did not "make sense." O'Kelly testified that Parker's behavior "wasn't really anything serious," and others "were laughing" and thought "it was funny." Later, however, Rodenbaugh went running through the house, hit his head on a shelf, and fell to the floor. After others helped him to his feet, Rodenbaugh ran down a hall and into a door, and fell down again. After that, Crowder, the Kealhofers, O'Kelly, and Daylin sat with Rodenbaugh for periods of time while Rodenbaugh lay on the floor. O'Kelly testified that Rodenbaugh was talking and sometimes coherent, but he also continued to repeat himself and say things that did not make sense.

¶7.     O'Kelly testified that, "[a]fter a while, [Rodenbaugh] seemed to have calmed down." O'Kelly then went to another part of the house to smoke a cigarette "to calm [himself] down because [he] was a little bit under the influence at the time." Crowder and the Kealhofers stayed with Rodenbaugh. Later, O'Kelly came back to check on Rodenbaugh, and he could see that Rodenbaugh's roommates were trying to talk to him, but Rodenbaugh's feet were "kind of spasming." O'Kelly claimed that he said, "[H]ey, if there's anything I can do, please let me know." He claimed that Crowder answered, "[I]t's okay; we got it." O'Kelly and Daylin then went back downstairs and smoked the hookah pipe again.

¶8.     Crowder and Sam Kealhofer testified at trial, and their testimonies were generally consistent with O'Kelly's testimony. They testified that they were not concerned when Rodenbaugh told them that he had taken acid, as they knew that he had taken acid before. Nor were they concerned when Rodenbaugh began "tripping," as he seemed to be fine. Even

4

after Rodenbaugh was lying on floor, repeating himself, and periodically tensing up or spasming, they did not believe that he needed medical attention—in part because they knew that O'Kelly and Daylin had taken the same drugs and were not experiencing any negative effects. Crowder and Sam Kealhofer testified that they called 911 only after Rodenbaugh began to turn blue and seemed to stop breathing. They both testified that O'Kelly and Daylin were not with Rodenbaugh by that point.

¶9. O'Kelly testified that he and Daylin were downstairs when one of the guests from the draft party told them that they had to leave immediately because an ambulance was on its way. O'Kelly and Daylin left and went back to O'Kelly's apartment. O'Kelly claimed that he tried to call several people to check on Rodenbaugh's condition, but he could not get in touch with anyone.

¶10. When paramedics arrived at Rodenbaugh's house, they attempted to resuscitate him. However, their efforts were unsuccessful, and Rodenbaugh was pronounced dead. Dr. Lisa Funte, a forensic pathologist from the State Medical Examiner's Office, later identified the cause of death as the toxic effects of NBOMe.

¶11. Around 5:30 a.m. on August 10, Lieutenant Shawn Word of the Starkville Police Department went to O'Kelly's apartment. Word called O'Kelly's cell phone and asked him to step outside to talk, and O'Kelly agreed. At the outset of their conversation, Word advised O'Kelly of his *Miranda* rights. O'Kelly acknowledged that he had been at Rodenbaugh's house the night before. Word then told O'Kelly that Rodenbaugh had died. Word testified

5

that O'Kelly "got emotional, went down in a crouching position," and stated, "I'm done with drugs." Word asked O'Kelly who else had taken the drugs, and O'Kelly stated that only he and Daylin had, and they were fine. O'Kelly told Word that there were no drugs in his apartment. O'Kelly told Word that he had only purchased five hits to begin with, and he, Daylin, and Rodenbaugh had taken all of them.

¶12. Word took O'Kelly to the police station for further questioning. At the station, Word again advised O'Kelly of his *Miranda* rights, and the interview was videotaped. O'Kelly reiterated that he had purchased only five hits of NBOMe and had paid $50 for them. O'Kelly stated that when Rodenbaugh was "on the floor" and "kept shaking," "he didn't know what to do" and "was getting freaked out." O'Kelly stated that "he couldn't take . . . watching his friend like" that, so he and Daylin went downstairs to smoke the hookah pipe. O'Kelly said that he went back to "check on [Rodenbaugh] periodically." Word asked O'Kelly why he did not call 911; O'Kelly "said he didn't know" and "was just hoping [Rodenbaugh would] work through it."

¶13. At the conclusion of the interview, Word told O'Kelly that he had a search warrant for O'Kelly's apartment, and Word asked again whether there were any drugs in the apartment. O'Kelly then admitted that he had paid $500 for 450 hits and that "less than 450 hits" were hidden in a bag in his closet.

¶14. Detective Bill Lott then conducted a videotaped interview of O'Kelly. Lott again advised O'Kelly of his rights and obtained a signed *Miranda* waiver at 6:40 a.m. At 7:06

6

a.m., O'Kelly signed a written statement consistent with his prior statements to Word. In his written statement, Word admitted that he had sold Rodenbaugh two hits of NBOMe for $10 per hit ($20 total) and "told him [he] could pay later."

¶15. Word subsequently found two sheets of NBOMe in 1/4" x 1/4" perforated squares (hits) in a bag in O'Kelly's closet, as O'Kelly had described. The sheets contained approximately 425 squares. In January 2015, O'Kelly was indicted for trafficking in a controlled substance, Miss. Code Ann. § 41-29-139(f) (Supp. 2014), and one count of second-degree or "depraved-heart" murder, Miss. Code Ann. § 97-3-19(1)(b) (Rev. 2014). The case eventually proceeded to trial in August 2016.

¶16. At trial, Dr. Funte testified that "NBOMe is incredibly potent" and "has been linked to death at very, very low levels of the drug." The drug "binds to a receptor in [the user's] brain" and can "stimulate[] a condition called serotonin syndrome." Dr. Funte testified that the effects of the drug are highly "unpredictable." She explained that although a person "might take the drugs several times and be fine," a single dose can lead to cardiac arrhythmias, muscle tissue breakdown, acute kidney failure, multi-organ system failure, and death. Dr. Funte testified that, even at a "[v]ery low level," the drug can cause "death quite rapidly." She testified that a person cannot "develop a tolerance" to NBOMe, "[s]o on any given day, you don't know whether that drug is going to cause an adverse reaction leading to your death."

¶17. On cross-examination, Dr. Funte testified that in August 2014 NBOMe "was in its

infancy as something that was showing up certainly around here," although in "other areas including other countries it was known and used." She testified that "[t]here was a statement put out by the DEA making it a controlled substance in November 2013." It "certainly [was] not as common as marijuana or cocaine . . . . But it was not unheard of." This was the first autopsy that Dr. Funte had performed involving a death linked to NBOMe.

¶18. At the close of the evidence, the circuit court instructed the jury on the elements of drug trafficking, depraved-heart murder, and the lesser-included offense of culpable-negligence manslaughter. The jury found O'Kelly guilty of drug trafficking and depraved-heart murder. The court sentenced O'Kelly to serve ten years in MDOC custody for drug trafficking and twenty years in MDOC custody for depraved-heart murder, with the sentences to run concurrently. O'Kelly filed a timely motion for judgment notwithstanding the verdict or a new trial, which was denied, and a timely notice of appeal.

## ANALYSIS

¶19. On appeal, O'Kelly raises three issues: (1) "whether the State proved all the elements of . . . drug trafficking beyond a reasonable doubt, and/or whether the verdict . . . was against the overwhelming weight of the evidence"; (2) "whether the State proved all the elements of . . . depraved-heart murder beyond a reasonable doubt, and/or whether the verdict . . . was against the overwhelming weight of the evidence"; and (3) whether the circuit court erred by denying his pretrial motion to suppress statements that he made to police. In the last section of his brief, O'Kelly briefly discusses four other alleged trial errors. We address O'Kelly's

8

arguments in turn below.

## I. Drug Trafficking

¶20. "The . . . test for sufficiency of the evidence is familiar." *Lenoir v. State*, 222 So. 3d 273, 278 (¶25) (Miss. 2017) (quoting *Poole v. State*, 46 So. 3d 290, 293 (¶20) (Miss. 2010)). "When this Court reviews the sufficiency of evidence supporting a guilty verdict, we view the evidence in the light most favorable to the State and decide if rational jurors could have found the State proved each element of the crime." *Id.* at 279 (¶25). "We are not required to decide—*and in fact we must refrain from deciding*—whether *we think* the State proved the elements." *Id.* (quoting *Poole*, 46 So. 3d at 293-94 (¶20)). "Rather, we must decide whether a reasonable juror could rationally say that the State did." *Id.* (quoting *Poole*, 46 So. 3d at 294 (¶20)).

¶21. When we review the denial of a motion for a new trial, we similarly consider "the evidence in the light most favorable to the verdict," and we will not reverse unless the "verdict . . . is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Little v. State*, 233 So. 3d 288, 292 (¶21) (Miss. 2017). As an appellate court, "[w]e do not make independent resolutions of conflicting evidence. Nor do we reweigh the evidence or make witness-credibility determinations." *Id.* at (¶20) (citation omitted). "Instead, when the evidence is conflicting, the jury will be the sole judge of the credibility of witnesses and the weight and worth of their testimony." *Id.* (quotation marks omitted). We review the trial judge's denial of a

9

motion for a new trial for abuse of discretion. *Id.* at (¶21).

¶22. On the charge of "trafficking in a controlled substance," the State was required to prove beyond a reasonable doubt that O'Kelly possessed forty or more dosage units of NBOMe with the intent to sell, barter, transfer, or dispense the drugs to another person. *See* Miss. Code Ann. § 41-29-139(f)(2)(A). O'Kelly argues that the State failed to prove (1) that he intended to distribute the drugs or (2) that he possessed forty or more dosage units. Both arguments are without merit.

¶23. The first argument is based on O'Kelly's testimony that he and Rodenbaugh intended to split the cost of the NBOMe and keep it for their own personal use. According to O'Kelly, Rodenbaugh "said he'd go in half." However, in his initial statement to the police, O'Kelly indicated that he alone purchased the drugs and was willing to sell hits for $10 apiece. O'Kelly's statement did not mention any sort of sharing arrangement, and he clearly stated that he gave Rodenbaugh two hits in exchange for a later payment of $20.

¶24. Moreover, "it is not necessary for the transferor to make a profit *or that there be consideration* for the transaction to constitute a transfer or distribution under the statute." *White v. State*, 842 So. 2d 565, 576 (¶33) (Miss. 2003) (emphasis added). "A 'transfer' under the statute for the delivery and transfer of narcotics is a change of possession from one person to another." *Johnson v. State*, 194 So. 3d 191, 197 (¶10) (Miss. Ct. App. 2016) (citing *White*, 842 So. 2d at 576 (¶32)). "To establish the defendant's intent to transfer within the meaning of the statute, all that is required is proof of the defendant's intent to relinquish

10

possession and control." *Id.* "The purpose of the statute is to thwart the exchange or transfer of the substance regardless of whether there was consideration for it." *Id.* Thus, even a simple plan to "share" one's drugs with others is sufficient to demonstrate an intent to distribute. *Id.* at (¶11). Therefore, O'Kelly's testimony at trial—that he intended to transfer half of his purchase to Rodenbaugh—was also sufficient to establish an intent to distribute. O'Kelly also admitted that he transferred drugs to Daylin on at least two occasions.

¶25. Finally, "a jury may reasonably conclude that a defendant intended to unlawfully distribute a controlled substance, if the quantity or nature of the seized substance evidences an intent to distribute—as opposed to an intent to merely possess for personal use." *Taylor v. State*, 656 So. 2d 104, 108 (Miss. 1995). O'Kelly possessed enough NBOMe to "trip" up to 425 times, depending on the number of hits taken. Based on O'Kelly's statements to police and testimony at trial, the jury reasonably could infer that such a quantity was not intended solely for his own personal use. Accordingly, there was sufficient evidence for the jury to find that O'Kelly possessed the NBOMe with the intent to distribute.

¶26. O'Kelly next argues that the State failed to prove that he possessed a sufficient quantity of NBOMe because the State tested only eight of the approximately 425 perforated squares found in his apartment. Claudette Gilman, a forensic chemist, testified that she selected eight random squares to test, and all eight contained 25B-NBOMe. O'Kelly argues that this evidence was insufficient because the trafficking statute requires proof of forty dosage units. Miss. Code Ann. § 41-29-139(f)(2)(A).

11

¶27. This Court addressed a similar argument in *Fay v. State*, 133 So. 3d 841, 844-45 (¶¶7-11) (Miss. Ct. App. 2013), *cert. denied*, 133 So. 3d 818 (Miss. 2014). Fay argued that the evidence was insufficient to convict him of possession of between 0.1 gram and two grams of methadone because the forensic chemist only tested one of several pill fragments from a bag found in Fay's pocket. *See id.* at 844 (¶8). However, this Court held that "a forensic chemist is generally not required to test all of the suspected narcotic substance to opine that the recovered substance as a whole contains narcotics." *Id.* at 844-45 (¶9) (quoting *People v. Adair*, 940 N.E.2d 292, 295 (Ill. App. Ct. 2010)) (brackets omitted). Rather, "random testing is permissible when the seized samples are sufficiently homogeneous so that one may infer beyond a reasonable doubt that the untested samples contain the same substance as those that are conclusively tested." *Id.* at 845 (¶9) (quoting *Adair*, 940 N.E.2d at 295) (brackets omitted). In *Fay*, we held that "it was not necessary for [the chemist] to test every pill fragment" because the pill fragments were all the same color and bore the same marking. *Id.* at (¶11). We concluded that "[b]ased on the relatively homogenous nature of the pill fragments," there was sufficient evidence for the jury to conclude that Fay possessed between 0.1 grams and two grams of methadone. *Id.*

¶28. The result is the same here. The perforated squares at issue were contained on only two sheets. Gilman testified that she randomly selected eight squares for testing, all of which tested positive for NBOMe. There is nothing in the record to suggest that the approximately 417 squares not tested were different in kind from the eight that were tested. Furthermore,

based on Dr. Funte's autopsy, the two hits that O'Kelly transferred to Rodenbaugh clearly contained NBOMe. It is also reasonable to infer that the hits that O'Kelly and Daylin took contained NBOMe. Finally, we note that O'Kelly himself told police officers and testified at trial that he purchased 450 hits of NBOMe. Based on Gilman's testimony and O'Kelly's admissions, we hold that the evidence was sufficient for a rational juror to find beyond a reasonable doubt that O'Kelly possessed at least forty dosage units of NBOMe with the intent to distribute. We also conclude that the trial judge did not abuse his discretion by denying O'Kelly's motion for a new trial on the drug trafficking charge.[2]

## II. Depraved-Heart Murder

¶29. O'Kelly next challenges the sufficiency of the evidence to support the conviction for depraved-heart murder. Depraved-heart murder, now classified as second-degree murder, is defined as "[t]he killing of a human being without the authority of law . . . in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any

---

[2] Although the issue is not identified in O'Kelly's statement of issues, O'Kelly also asserts that the jury instruction on the elements of drug trafficking was inconsistent with his indictment. The indictment charged O'Kelly with "traffick[ing] in a controlled substance by unlawfully, willfully, and feloniously[] possessing 25-NBOMe, in an amount greater than 40 dosage units, in violation of [section] 41-29-139." The indictment clearly charged drug trafficking and specifically referenced subsection 41-29-139(f). The statute makes clear that, as relevant in this case, trafficking in a controlled substance means possession of more than forty dosage units with the intent to distribute. *See* Miss. Code Ann. §§ 41-29-139(f)(2)(A), 41-29-139(a). Moreover, the jury instruction correctly set out the elements of the crime: possession of forty or more dosage units with the intent to distribute. There is no merit to O'Kelly's claim that the instruction was defective.

particular individual . . . ." Miss. Code Ann. § 97-3-19(1)(b). "The Supreme Court has described conduct 'evincing a depraved heart' as 'grave recklessness manifesting utter disregard or indifference to a resultant creation of eminent danger to human life.'" *McCarty v. State*, 247 So. 3d 260, 269 (¶27) (Miss. Ct. App. 2017) (brackets omitted) (quoting *Windham v. State*, 602 So. 2d 798, 802 (Miss. 1992)), *cert. denied*, 246 So. 3d 885 (Miss. 2018).

¶30.    The jury in this case also was instructed on the lesser-included offense of culpable-negligence manslaughter. *See Shumpert v. State*, 935 So. 2d 962, 965-68 (¶¶7-17) (Miss. 2006) (recognizing that culpable-negligence manslaughter is a lesser-included offense of depraved-heart murder). Under the "direct remand rule," if we concluded that the evidence was insufficient to prove murder but sufficient to prove manslaughter, we would remand the case and direct the circuit court to sentence the defendant on the lesser-included offense of manslaughter. *See Shields v. State*, 722 So. 2d 584, 585-86 (¶¶7-11) (Miss. 1998); *Hull v. State*, 174 So. 3d 887, 897 (¶28) & n.3 (Miss. Ct. App. 2015).

¶31.    Culpable-negligence manslaughter is the "killing of a human being, by the act, procurement, or culpable negligence of another, and without authority of law." Miss. Code Ann. § 97-3-47 (Rev. 2014). Our Supreme Court has defined "culpable negligence" as "negligence of a degree so gross as to be tantamount to a wanton disregard, or utter indifference to, the safety of human life." *McCarty*, 247 So. 3d at 269 (¶29) (quoting *Hawkins* v. State, 101 So. 3d 638, 643 (¶17) (Miss. 2012)). "Depraved-heart murder and

14

culpable negligence manslaughter are distinguishable simply by degree of mental state of culpability. In short, depraved-heart murder involves a higher degree of recklessness from which malice may be implied." *Hawkins*, 101 So. 3d at 643 (¶17).

¶32. We conclude that the evidence at trial was insufficient to establish either depraved-heart murder or culpable-negligence manslaughter. As discussed above, O'Kelly testified that he and Rodenbaugh had taken NBOMe together previously. Rodenbaugh's roommates also testified that they knew that Rodenbaugh had taken "acid" on prior occasions. In addition, O'Kelly testified that, prior to August 9, 2014, he and Daylin had both taken hits from the same sheets at issue in this case. There is no evidence that O'Kelly, Rodenbaugh, or Daylin had experienced any adverse effects when using NBOMe previously, and O'Kelly testified that he did not know that NBOMe was dangerous. Indeed, on the night in question, O'Kelly himself took the same number of hits as Rodenbaugh.

¶33. Dr. Funte testified at trial that "NBOMe is incredibly potent" and "has been linked to death at very, very low levels of the drug." She also testified that the drug is highly unpredictable so that a single dose can cause death in a short period of time. She further testified that a person cannot "develop a tolerance" to NBOMe, so a person's past experience with the drug is not a good indicator of its potential to cause harm.

¶34. However, Dr. Funte also testified that in August 2014 NBOMe "was in its infancy as something that was showing up certainly around here," although in "other areas including other countries it was known and used." She testified that "[t]here was a statement put out

15

by the DEA making it a controlled substance in November 2013." This was the first autopsy that Dr. Funte had performed involving a death linked to NBOMe.

¶35. The case was submitted to the jury on the theory that O'Kelly committed depraved-heart murder by "selling [Rodenbaugh] the controlled substance 25B-NBOMe." Similarly, the instruction on culpable-negligence manslaughter required a finding that O'Kelly acted "with culpable negligence . . . by selling/bartering/transferring/distributing/dispensing to [Rodenbaugh] the controlled substance 25B-NBOMe." It is important to note that the jury was *not* instructed that it could find O'Kelly guilty of murder or manslaughter for failing to seek medical aid after Rodenbaugh began experiencing adverse effects from the drug.[3] Thus, the narrow issue before this Court is whether, based on the evidence at trial, O'Kelly's singular act of selling or giving Rodenbaugh two hits of NBOMe rises to the level of depraved-heart murder or culpable-negligence manslaughter.

¶36. The Kentucky Supreme Court addressed similar facts and issues in *Lofthouse v. Commonwealth*, 13 S.W.3d 236 (Ky. 2000). There, the defendant (Lofthouse) "admitted that he furnished the cocaine and heroin to Buford while visiting in Buford's home on the night in question." *Id.* at 237. "[Lofthouse] and Buford had 'shot' cocaine together on previous occasions without life-threatening results." *Id.* at 237-38. "[Lofthouse] had obtained the cocaine and heroin from his regular drug supplier, who sold him the cocaine, but gave him

---

[3] *See, e.g.*, *State v. Morgan*, 936 P.2d 20, 23 (Wash. Ct. App. 1997) (affirming conviction for manslaughter based on the defendant assisted or enabled the decedent's drug use and then failed to seek medical help when she overdosed); *People v. Oliver*, 210 Cal. App. 3d 138, 149 (Cal. Ct. App. 1989) (similar).

16

the heroin as 'something new' [to] try." *Id.* at 238. "[Lofthouse] had, himself, ingested some of the heroin prior to the night of Buford's death." *Id.* On the night in question, Lofthouse and Buford both drank beer and injected themselves with cocaine and heroin. *Id.* "Buford told [Lofthouse] that he had seen heroin before and knew what it was." *Id.* However, after several hours of drinking and drug use, Buford lost consciousness and died from the toxic effects of the drugs and alcohol. *Id.*

¶37.    A jury found Lofthouse guilty of "reckless homicide," which under Kentucky law "required proof beyond a reasonable doubt that there was a substantial and unjustifiable risk that Buford would die if he ingested the cocaine and heroin furnished to him by [Lofthouse], and that the risk of Buford's death was of such nature and degree that [Lofthouse's] failure to perceive it constituted a gross deviation from the standard of care that a reasonable person would observe in the situation." *Id.* at 241. However, the Kentucky Supreme Court reversed and rendered the conviction. *Id.* at 242. The court rejected Lofthouse's argument "that furnishing controlled substances to one who subsequently dies from their ingestion can *never* support a conviction of criminal homicide"; however, the court also rejected the state's argument that the provision of controlled substances to a person who thereafter dies "will *always* support a conviction." *Id.*[4] Instead, the court held that such a case, "like any other," "depends on the proof." *Id.* The court held that to obtain a conviction, the state must prove

_____

[4] The court reversed Lofthouse's conviction by a 5–1 vote. The opinion discussed in the text was a three-justice plurality opinion. Two justices would have gone further and held that the act of providing drugs to another could never be considered reckless homicide. *See id.* at 243-44 (Stumbo, J., concurring).

17

beyond a reasonable doubt "that a layperson, such as [Lofthouse], should reasonably have

known that there was a substantial risk that the amount of cocaine and heroin ingested by

Buford would result in his death." *Id.* The court further stated: "That is especially true

where, as here, [Lofthouse] did not directly cause the victim's death, but only furnished the

means by which the victim caused his own death." *Id.*

¶38. The court went on to hold that the evidence was insufficient to convict Lofthouse

despite evidence that the quantities of heroin found in Buford "could be fatal." *Id.* The court

explained its conclusion as follows:

> [T]here was no proof that [Lofthouse] or any other layperson should have been
> aware that there was a substantial risk that Buford would die from ingesting
> those substances, or that [Lofthouse's] failure to perceive that risk constituted
> a gross deviation from the standard of care that a reasonable person would
> observe in the situation. Such information is not "common knowledge." On
> the other hand, there was evidence that heroin was "something new" to
> [Lofthouse]; that he, himself, had previously ingested dosages of both the
> cocaine and the heroin in question without a fatal result; and that he, himself,
> ingested the same dosages of cocaine and heroin as Buford on the same
> occasion, yet remained coherent enough to assist in efforts to save Buford's
> life. The Commonwealth proved only that the dosages were fatal to Buford.
> That alone was insufficient to convict [Lofthouse] of reckless homicide.

*Id.* at 241-42.[5]

---

[5] The court distinguished cases from other states in which "there was evidence that another of [a] defendant's customers had died the same way two weeks earlier," the "defendant knew that the heroin sold to the victim was 'uncut' and dangerous because it had not been diluted," or "the defendant injected the victim with heroin after she was already 'bombed out' on depressants and," by his own admission, "was aware of the substantial possibility that the injection would cause the victim's death." *Id.* at 241 (distinguishing *State v. Randolph*, 676 S.W.2d 943 (Tenn. 1984), and *People v. Cruciani*, 327 N.E.2d 803 (N.Y. 1975)).

18

¶39. The facts of this case are similar to *Lofthouse*. O'Kelly and Rodenbaugh had both taken NBOMe and similar drugs on prior occasions without any adverse effects. Moreover, O'Kelly "himself[] ingested the same [number of hits] as [Rodenbaugh] on the same occasion, yet remained coherent." *Id.* O'Kelly's own use of NBOMe shows that he did not perceive that it posed any substantial or imminent risk of death. Dr. Funte testified that "NBOMe is incredibly potent" and "has been linked to death at very, very low levels of the drug." She also testified that its effects are highly "unpredictable." However, she also agreed that NBOMe was a relatively new drug in August 2014. There was no evidence the drug's dangers were "common knowledge" in August 2014. *Id.* As in *Lofthouse*, "there was no proof that [O'Kelly] or any other layperson should have been aware that there was a substantial risk that [Rodenbaugh] would die from ingesting [NBOMe]." *Id.*

¶40. The Kentucky Supreme Court's opinion addressing similar facts and issues in *Lofthouse* is persuasive. We likewise conclude that, based on the evidence admitted at trial, O'Kelly's singular act of selling or giving Rodenbaugh two hits of NBOMe is insufficient to demonstrate either "grave recklessness manifesting utter disregard or indifference to a resultant creation of eminent danger to human life" (depraved-heart murder) or "negligence of a degree so gross as to be tantamount to a wanton disregard, or utter indifference to, the safety of human life" (culpable-negligence manslaughter). *McCarty*, 247 So. 3d at 269 (¶¶27, 29). Therefore, we reverse and render a judgment of acquittal on Count II of the indictment.

### III.  Motion to Suppress

¶41.    As described above, O'Kelly spoke to Lieutenant Word at his apartment and again at the police station.  Lieutenant Word testified that he advised O'Kelly of his *Miranda* rights prior to those statements, and O'Kelly agreed to talk.  In addition, Detective Bill Lott interviewed O'Kelly at the police station after obtaining a signed *Miranda* waiver. O'Kelly's interviews at the police station were videotaped.  O'Kelly also signed a written statement following his interview with Lott, which was admitted into evidence at trial.

¶42.    Prior to trial, O'Kelly filed a two-page motion to suppress "any and all statements, admissions, and/or purported confessions whether oral, written or otherwise recorded made by [him] to law enforcement officers . . . while in custody."  He also moved to suppress "any and all evidence obtained as a result of [his] illegal interrogation."  O'Kelly argued that he did not knowingly, voluntarily, and intelligently waive his *Miranda* rights because he was under the influence of drugs and alcohol, had been up for over eighteen hours without sleep, and had just been informed of his friend's death.

¶43.    At the pretrial suppression hearing, Word testified that he advised O'Kelly of his rights at the very beginning of their conversation at the apartment.  A second officer—Taylor Wells—who was present at the apartment corroborated Word's testimony.  Word and Wells both testified that O'Kelly did not appear to be under the influence of drugs or alcohol, that his speech was normal, and that he was lucid and coherent.  Both testified that O'Kelly appeared to understand his rights and that his statements were made voluntarily, without any

20

threats or coercion. Word also testified that O'Kelly was not in custody at the outset of their conversation.

¶44. Detective Lott also testified that O'Kelly did not appear to be under the influence at the police station, that his speech was normal, and that his statements were lucid. Lott testified that O'Kelly signed the *Miranda* waiver voluntarily.

¶45. O'Kelly did not testify at the suppression hearing. The trial judge denied the motion to suppress, finding that O'Kelly's *Miranda* waivers and subsequent oral and written statements were knowingly, voluntarily, and intelligently given.

¶46. On appeal, O'Kelly makes a somewhat different and narrower argument than he did in the circuit court. His two-paragraph appellate argument cites no authority and focuses entirely on statements that he made to Lieutenant Word at his apartment. He argues that he "was high on drugs," "had just been told that [Rodenbaugh] had died," and later "had no recollection of receiving a *Miranda* warning." O'Kelly acknowledges that at the police station he "was read his rights, asked if he understood his rights, and then signed a [written waiver]." But he argues this was "too late as the damage had already been done."

¶47. O'Kelly's argument on appeal is without merit for several reasons. First, he cites no legal authority and fails to develop the argument. *See Summerall v. State*, 734 So. 2d 242, 246 (¶20) (Miss. Ct. App. 1999) ("Failure to cite to legal authority bars any consideration of the assigned error."). Second, because O'Kelly did not testify at the suppression hearing, there was no evidence before the trial judge that O'Kelly was still "high on drugs" or did not

recall receiving a *Miranda* warning. *See, e.g.*, *Moffett v. State*, 49 So. 3d 1073, 1101 (¶91) (Miss. 2010) ("We will not hold a trial court in error on appeal for a matter not presented to it for decision." (internal quotation marks omitted)). Third, the testimony of Word and Wells is substantial evidence that supports the trial judge's finding that O'Kelly's waiver and subsequent statements were given knowingly, voluntarily, and intelligently. *See Holland v. State*, 587 So. 2d 848, 860 (Miss. 1991) (holding that a trial judge's finding that a waiver was knowing, voluntary, and intelligent must be affirmed if it was "based . . . upon appropriate principles of law" and "is supported by . . . substantial evidence"). This is particularly true since O'Kelly presented no countervailing evidence at the suppression hearing.

¶48. In addition, O'Kelly fails to address the admissibility of his subsequent oral and written statements at the police station, which provided more detail and more incriminating information than his initial statements to Word at the apartment. Any challenge to those subsequent statements would raise different legal issues, which O'Kelly's appellate briefs simply do not address. In the absence of any challenge to O'Kelly's subsequent statements, we cannot say that O'Kelly was prejudiced by the admission of his statements to Word at the apartment.

¶49. In summary, there is substantial evidence to support the trial judge's decision denying the motion to suppress, and this issue is without merit.

### IV. Additional Issues

¶50. In the last section of his brief, under the heading "Statement of Additional Grounds

on Appeal," O'Kelly asserts that "there are several additional grounds which support a reversal and remand of this case." He then briefly discusses four alleged trial errors. However, he cites no authority, and these alleged errors are not listed in his statement of issues. The State argues that these issues are waived as a result. *See, e.g.*, *Reed v. State*, 987 So. 2d 1054, 1056 (¶8) (Miss. Ct. App. 2008) (declining to address issues not listed in the appellant's statement of issues); *Summerall*, 734 So. 2d at 246 (¶20) ("Failure to cite to legal authority bars any consideration of the assigned error.").

¶51. We conclude that it is unnecessary to address these issues because all involve evidence (either admitted or excluded) or arguments of counsel that relate to O'Kelly's conviction for murder, which we reverse and render. We cannot see that any of the alleged errors contributed to O'Kelly's conviction for drug trafficking.

¶52. However, we will briefly discuss one of these issues to address some apparent confusion. O'Kelly argues that the circuit court erroneously admitted a November 15, 2013 DEA press release announcing that NBOMe had been listed as a Schedule I controlled substance. *See supra* n.1.[6] However, the press release was *not* admitted into evidence. At trial, the State attempted to introduce the November 2013 DEA final order or a related press release. The State argued that the order was relevant because it reported that NBOMe had been implicated in seventeen deaths, including fourteen from acute toxicity. However, O'Kelly objected on relevance grounds, and the circuit court sustained the objection. The

_____

[6] O'Kelly's brief mistakenly states that the release was dated November 15, 2014.

23

State subsequently asked the court to reconsider, but the court adhered to its prior ruling.[7]

¶53.   On cross-examination, the State asked O'Kelly whether he was aware that seventeen deaths had been attributed to NBOMe.  O'Kelly's counsel objected, but the circuit court overruled his objections, mistakenly stating that a "[p]revious witness . . . testified to that." Presumably, the court was referring to Dr. Funte, but Dr. Funte only testified that the DEA made NBOMe a controlled substance in November 2013.  She did not testify about the contents of the DEA order or that any specific number of deaths had been linked to NBOMe. O'Kelly answered that he was not aware of any reported deaths from NBOMe.

¶54.   Finally, in closing argument, the State argued that in November 2013 the DEA reported that there had been "nineteen deaths" linked to NBOMe.  O'Kelly's counsel objected and moved for a mistrial, arguing that the State was "reading something not in evidence."  The court sustained the objection but denied the motion for a mistrial.  The State then repeated that "nineteen deaths" had been linked to NBOMe by November 2013.

¶55.   "[Q]uestions asked by lawyers [are] not evidence—only the answers given by witnesses."  *May v. State*, 460 So. 2d 778, 783 (Miss. 1984).  Therefore, the questions that O'Kelly was asked on cross-examination had no evidentiary value.  Likewise, "arguments of counsel are not evidence."  *One 1970 Mercury Cougar v. Tunica Cty.*, 115 So. 3d 792, 796 (¶20) (Miss. 2013).  Thus, there was no competent evidence of the contents of the November

_____

[7] The State does not challenge the circuit court's ruling on appeal, so the issue is not before this Court.  *See Burks v. United States*, 437 U.S. 1, 5 n.4 (1978) ("There is no claim in this case that the trial court committed error by excluding prosecution evidence which, if received, would have rebutted any claim of evidentiary insufficiency.").

2013 DEA order or the number of deaths that had been attributed to NBOMe—only that the DEA had designated NBOMe as a controlled substance.

¶56. As stated above, because we reverse and render O'Kelly's conviction for depraved-heart murder, we need not address his other "additional grounds on appeal."

## V. Resentencing

¶57. "[W]hen a defendant is convicted of more than one count of a multicount indictment, the [circuit] court is likely to fashion a sentencing package in which sentences on individual counts are interdependent." *Sallie v. State*, 237 So. 3d 749, 756-57 (¶29) (Miss. 2018) (quoting *United States v. Shue*, 825 F.2d 1111, 1114 (7th Cir. 1987)). "[B]ecause the sentences are interdependent, reversal of convictions underlying some, but not all, of the sentences renders the sentencing package ineffective in carrying out the [circuit] court's sentencing intent as to any one of the sentences on the affirmed convictions." *Id.* at 757 (¶29) (quoting *Shue*, 825 F.2d at 1114). "'[A]fter an appellate court unwraps' the original sentencing package by removing 'one or more charges from its confines, . . . common sense dictates that the judge should be free to review the efficacy of what remains in light of the original plan,' and be allowed 'to reconstruct the sentencing architecture upon remand, within applicable constitutional and statutory limits, if that appears necessary in order to ensure that the punishment still fits both crime and criminal.'" *Id.* at 756 (¶28) (quoting *United States v. Pimienta-Redondo*, 874 F.2d 9 (1st Cir. 1989)).

¶58. In this case, the circuit court sentenced O'Kelly to concurrent terms of twenty years

in MDOC custody for depraved-heart murder and ten years in MDOC custody for drug trafficking. Under the drug trafficking statute, the court could have imposed a longer sentence. *See* Miss. Code Ann. § 41-29-139(f). As our Supreme Court reasoned in *Sallie*, it is possible that the circuit court's original sentence for drug trafficking was influenced by the murder sentence that the court imposed the same day. O'Kelly's conviction and sentence for murder now stand reversed. The Supreme Court's opinion in *Sallie* makes clear that in this situation the proper course is to remand the case to the circuit court for resentencing on the remaining conviction for drug trafficking. *See Sallie*, 237 So. 3d at 755-57 (¶¶26-30). Therefore, pursuant to *Sallie*, we remand the case to the circuit court for resentencing.

## CONCLUSION

¶59. We affirm O'Kelly's conviction for trafficking in a controlled substance. We reverse and render a judgment of acquittal on Count II of the indictment, charging depraved-heart murder, because there is insufficient evidence to support that charge or the lesser-included offense of culpable-negligence manslaughter. We remand the case for resentencing on the charge of trafficking in a controlled substance.

¶60. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART; REMANDED.**

**IRVING AND GRIFFIS, P.JJ., BARNES, FAIR, WESTBROOKS AND TINDELL, JJ., CONCUR. LEE, C.J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY IRVING, P.J., WESTBROOKS AND TINDELL, JJ. CARLTON, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. GREENLEE, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION.**

**LEE, C.J., SPECIALLY CONCURRING:**

¶61.    I agree with the majority that the evidence is insufficient to support O'Kelly's conviction for depraved-heart murder, and therefore, should be reversed.

¶62.    I write separately to express that I disagree, however, that where we have affirmed O'Kelly's conviction for trafficking in a controlled substance, the case should be remanded for resentencing on the trafficking conviction.  I recognize that the majority correctly relies on the Mississippi Supreme Court's recent decision in *Sallie v. State*, 237 So. 3d 749 (Miss. 2018), for its course in remanding the case for resentencing on the trafficking conviction. But, for the same reasons I dissented in *Sallie v. State*, 237 So. 3d 758, 762 (¶11) (Miss. Ct. App. 2016), I am again compelled to state my concerns that this presents the circuit court with an opportunity to improperly amend O'Kelly's sentence on his affirmed trafficking conviction.

¶63.    Our caselaw has long held that, "Once a circuit or county court exercises its option to impose a definite sentence it cannot subsequently set that sentence aside and impose a greater sentence," as "such alterations are improper." *Eastman v. State*, 909 So. 2d 171, 173 (¶10) (Miss. Ct. App. 2005).  But this new course, as permitted by the supreme court's decision in *Sallie*, gives the circuit court the opportunity to do just that.  I fundamentally disagree that where an appellate court has found one conviction or sentence improper, we should disrupt that which was not found improper.  Just as when "a case is affirmed on appeal, the lower court is issued a mandate to perform purely ministerial acts in carrying out

27

the original sentence[]" so also should it be where an individual conviction is affirmed on appeal. *Sallie,* 237 So. 3d at 753-54 (¶18). Accordingly, I would find that in the instant case, the circuit court should only perform the ministerial act of rendering a judgment of acquittal on O'Kelly's depraved-heart-murder conviction and imposing the original sentence as to his trafficking conviction.

¶64. *Sallie*'s holding gives way to punish a defendant who prevails in part on appeal by exposing him to a greater sentence than he originally incurred—even for the conviction that was affirmed. Despite his success, the circuit court may still exact "one pound of flesh,"[8] except in this instance—maybe more, maybe less. For these reasons, I specially concur.

**IRVING, P.J., WESTBROOKS AND TINDELL, JJ., JOIN THIS OPINION.**

**CARLTON, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶65. I respectfully concur in part and dissent in part from the majority's opinion. I concur with the majority in affirming O'Kelly's conviction for trafficking in a controlled substance. I dissent from the majority's finding that the evidence is insufficient to establish depraved-heart murder. The majority finds that the sufficiency and weight of the evidence fail to support O'Kelly's conviction for depraved-heart murder or the lesser-included offense of culpable-negligence manslaughter, and the majority reverses and renders a judgment of acquittal on that count. Because I submit that the evidence presented at trial sufficiently supports O'Kelly's conviction for depraved-heart murder, then, in keeping in mind our

---

[8] William Shakespeare, *The Merchant of Venice*, act 4, sc. 2.

28

standard of review, I would affirm O'Kelly's conviction and sentence. *See Gary v. State*, 237 So. 3d 140, 147-48 (¶¶35, 38) (Miss. 2018).[9]

¶66. The Mississippi Supreme Court has recognized a broad interpretation of depraved-heart murder. *Clayton v. State*, 652 So. 2d 720, 726 (Miss. 1995) (citing *Mallett v. State*, 606 So. 2d 1092 (Miss. 1992) and *Windham v. State*, 602 So. 2d 798 (Miss. 1992)). Additionally, depraved-heart murder is defined by Mississippi Code Annotated section 97-3-19(1)(b) (Rev. 2014) as the following:

> (1) The killing of a human being without the authority of law by any means or in any manner shall be murder . . .
>
> . . . .
>
> > (b) [w]hen done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual. . . .

¶67. The record reflects that the State presented sufficient evidence as to the essential elements of depraved-heart murder. The supreme court has described conduct evincing a depraved heart as "grave recklessness manifesting utter disregard or indifference to the resultant creation of eminent danger to . . . [human] life." *Windham*, 602 So. 2d at 802. As

---

[9] "When reviewing the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 147 (¶35) (internal quotation mark omitted). When reviewing the weight of the evidence, "we weigh the evidence in the light most favorable to the verdict, only disturbing a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id*. at 147-48 (¶38) (internal quotation mark omitted).

stated in the plain language of the statute, no premeditated design to effect the death of any particular individual is required. In viewing the evidence in the light most favorable to the State, the record shows that rational jurors could have found the State proved each element of the crime.

**GREENLEE, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶68. I join the majority in affirming O'Kelly's conviction for trafficking in a controlled substance and in finding the evidence insufficient to establish depraved-heart murder. But I dissent to the extent the majority finds the evidence insufficient to establish culpable-negligence manslaughter.

¶69. In this case, the jury convicted O'Kelly of depraved-heart murder and therefore implicitly found him guilty of the lesser-included offense of culpable-negligence manslaughter.[10] *Shields v. State*, 722 So. 2d 584, 587 (¶7) (Miss. 1998) ("[G]uilt of a true lesser[-]included offense is implicitly found in the jury's verdict of guilt on the greater offense."). Culpable-negligence manslaughter is the "killing of a human being, by the act, procurement, or culpable negligence of another, and without authority of law." Miss. Code Ann. § 97-3-47 (Rev. 2014). It is distinguishable from depraved-heart murder "simply by degree of mental state of culpability." *Hawkins v. State*, 101 So. 3d 638, 643 (¶17) (Miss. 2012).

¶70. At the time O'Kelly gave NBOMe to Rodenbaugh, it had been on the federal Drug

---

[10] By statute, manslaughter is a lesser-included offense of murder. *See* Miss. Code Ann. § 97-3-19 (Rev. 2014).

30

Enforcement Administration's and Mississippi's lists of controlled substances. Expert testimony indicated that NBOMe is incredibly potent, has been linked to death at very low levels, and can cause death in a short period of time. In addition, users of NBOMe cannot develop a tolerance to it, and it is impossible to predict which concentration of the drug could result in death. Given the properties of this drug and its illicit procurement, a reasonable juror could find that O'Kelly's act of giving it to Rodenbaugh was "negligence of a degree so gross as to be tantamount to a wanton disregard, or utter indifference to, the safety of human life." *McCarty v. State*, 247 So. 3d 260, 269 (¶29) (Miss. Ct. App. 2017).

¶71. Because the jury's verdict encompassed a finding of guilt as to the lesser-included offense of culpable-negligence manslaughter, I would remand this case to the trial court for resentencing on only culpable-negligence manslaughter. Alternatively, as the majority seems to determine that the verdict "is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice," the proper remedy would be to grant a new trial on the basis of culpable-negligence manslaughter. *Little v. State*, 233 So. 3d 288, 292 (¶21) (Miss. 2017). I therefore respectfully concur in part and dissent in part.