# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2021-KA-00317-SCT

*DAVID MILTON SILLS a/k/a DAVID SILLS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/03/2021 |
| TRIAL JUDGE: | HON. JAMES T. KITCHENS, JR. |
| TRIAL COURT ATTORNEYS: | PAYTREEN KEYUM DAVIDSON |
| | BENJAMIN RUSH, JR. |
| | FORREST ALLGOOD |
| | SCOTT WINSTON COLOM |
| COURT FROM WHICH APPEALED: | OKTIBBEHA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | MARK ANDREW CLIETT |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | SCOTT WINSTON COLOM |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 04/06/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE RANDOLPH, C.J., MAXWELL AND BEAM, JJ.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1.     David Sills was convicted in the Oktibbeha County Circuit Court of possession of methamphetamine greater than two grams but less than ten grams in violation of Mississippi Code Section 41-29-139 (Rev. 2018).  Sills appeals claiming (1) the jury's verdict was against the overwhelming weight of the evidence; (2) the State failed to meet its burden of proof regarding constructive possession; and (3) the trial court erred by denying Sills's

motion to suppress illegally obtained evidence. Finding no merit to either claim, we affirm Sills's conviction.

**FACTS**

¶2. On February 19, 2015, Todd Jackson, owner of Tower and Tower Construction, called the Clay County Sheriff's Department to report that his 2014 Ford F-350 was stolen and had been missing for three days. Jackson told Investigator Terry Scott that his foreman, Sills, had taken the truck. Jackson was tracking Sills through his fuel card, and the last place Sills had used the card was in Jackson, Mississippi. Investigator Scott issued a "be on the lookout" (BOLO) bulletin for Sills and the truck.

¶3. Shortly after the BOLO was issued, Officer Brandon Hernandez with the Starkville Mississippi, Police Department spotted the truck traveling on Highway 12 in Starkville. Officer Hernandez radioed his supervisor who instructed him to wait for backup before stopping the truck. When the other officers arrived, Officer Hernandez stopped the truck at an intersection in Starkville.

¶4. Officer Hernandez confirmed that the driver was Sills, the only person inside the truck. Sills was handcuffed and placed in the back of Officer Hernandez's patrol vehicle.

¶5. According to Officer Hernandez, he transported Sills to the Starkville police station to await arrival of the Clay County officials who had been notified of Sills's apprehension. While at the Starkville police station, Sills told Officer Hernandez that he had been "smoking crystal meth all day" and that he was driving his boss's truck and did not show up for work.

2

¶6. Meanwhile, Starkville Police Officers Lovrent Gaines and Tyler Davis conducted an inventory search of the truck prior to having it towed. Officer Gaines testified that he noticed the driver's seat was wet and smelled like urine. Officer Gaines recovered a pipe, which contained a rock-like substance similar to what Officer Gaines had noticed on the floorboard. He also recovered a rock-like substance from in between the driver's seat and the console, which he described as "black shiny crystal-like." Officer Gaines said he did not know what the substance was, and he had Officer Davis "test it with a pill kit." The substance "tested positive for methamphetamine."

¶7. Sergeant Scotty Carrouthers, who was a narcotics investigator for the Starkville police at the time, subsequently took the evidence to the crime lab in Columbus, Mississippi for further analysis. Claudette Gilman of the crime lab was accepted at trial as an expert in controlled-substance analysis. She testified that she had tested and analyzed the evidence and that it contained 2.09 grams of methamphetamine.

¶8. Sills testified at trial that he was from Indiana and traveled for work, building and repairing TV towers. He had worked for Coast-to-Coast Tower Service for about eighteen years and was its foreman. He was working a job in West Point, Mississippi, and had been there about three weeks at the time of his arrest.

¶9. Sills said that he worked with five other crew members and that they shared two work trucks, a F-550 and a F-350. Sills said he drove the F-550 most of the time, while the F-350 was used more as a crew truck.

3

¶10.    Sills said he talked to Jackson on February 16, 2015, and told him an ice storm was coming and that the crew would not be able to work for about five to seven days. So Sills wanted to go see his family in Indiana. Jackson did not give Sills permission to leave.

¶11.    Sills then decided to take the F-350 to Dallas, Texas, where his personal truck was located, and then drive to Indiana. Sills said he told Jackson that he was going to quit and that if Jackson did not want that, Jackson could call him back for work after Sills got his personal truck.

¶12.    Sills said he left in the F-350 the next day on February 17. He said that while he usually drives the F-550, he left the F-550 for the crew to use because it houses a fuel cell on the bed of the truck, which the crew uses to fuel up equipment.

¶13.    According to Sills, when he arrived at Jackson's house in Dallas, he learned that Jackson had taken Sills's personal truck and had driven it to West Point. Sills then drove back to back to West Point to get his truck.

¶14.    Before reaching West Point, Sills stopped at a McDonald's drive-through in Starkville on the night of February 19. As he pulled out from McDonald's onto Highway 12, numerous police cars surrounded him. Sills said it scared him so much that he urinated in his pants. Sills got out of the truck, was placed in handcuffs, and was placed in Officer Hernandez's vehicle. He was taken to the Starkville police station. He was there for about ten minutes before a Clay County officer came and picked him up.

4

¶15. Sills said he spent the night in jail in Clay County and was bonded out the next afternoon by guys who worked for him, who then took him to his truck. Sills said that Jackson had already picked up the F-350 from impound in Starkville. Sills drove to the Starkville police station, where he picked up his cell phone and prescription medications that he had left in the F-350. Sills then left for Indiana.

¶16. Sills said nobody ever said anything to him about methamphetamine being found in the F-350. When he learned he had been indicted for possession of methamphetamine, Sills "thought it was a joke."

¶17. Sills denied telling anyone that he had been using methamphetamine. He stated that he had "never used methamphetamine in my life." And he did not know what it looked like. He said the F-350 he was driving was always kept spotless, and he did not remember seeing any type of trash in it except for the McDonald's bag, which contained the food he had just purchased. He further testified that the floorboard and the floor mats were black.

¶18. The jury found Sills guilty of possession of methamphetamine greater than two grams, but less than ten grams, pursuant to Mississippi Code Section 41-29-139(c)(1)(C). Sills appeals from his conviction, claiming that the jury's verdict was against the overwhelming weight of the evidence and that the State failed to prove constructive possession. Sills also claims that the trial court erred by denying his pretrial motion to suppress evidence and dismiss the case. The trial court had denied Sills's motion after finding that the search was

a valid inventory search and that the substances found were part of a legal search. We address the latter claim first.

## DISCUSSION

### I.      Motion to Suppress

¶19.    Sills maintains that Starkville police's search of the vehicle does not meet either exception provided by the United States Supreme Court in *Arizona v. Gant*, 556 U.S. 332, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009). In *Gant*, the Court held that:

> Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest. When these justifications are absent, a search of an arrestee's vehicle will be unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies.

*Id.* at 351.

¶20.    Sills claims that he had already been removed from the scene when the search took place, and he was not arrested based on the suspicion of transporting or being in possession of any illegal narcotics. Thus, he argues neither *Gant* exception was present here.

¶21.    Sills further claims that Sergeant Carrouthers testified at trial that there was no inventory list of what was found in the vehicle, and he was not sure if the search conducted was an inventory search or a search incident to arrest.

¶22.    The State argues that Sills had no standing to challenge the search of the truck because he stole the truck and thus had no reasonable expectation of privacy under either the federal

6

or state constitutions. The State further contends that even if Sills had standing, **Gant** is inapplicable when an inventory search was conducted, rather than a search incident to arrest.

¶23. While there does not appear to be a Mississippi case directly on point, the overwhelming majority of decisions from other jurisdictions hold that "the thief of a vehicle does not have a sufficient privacy interest in the car to challenge the search" of it. **State v. Wickliffe**, 826 P.2d 522, 527 (Kan. Ct. App. 1992); *see also* **State v. Zakel**, 812 P.2d 512, 515 (Wash. Ct. App. 1991); **State v. Wickline**, 440 N.W.2d 249, 253 (Neb. 1989), *disapproved of on other grounds by* **State v. Sanders**, 455 N.W.2d 108 (Neb. 1990); **Jackson v. State**, 745 S.W.2d 4, 7-8 (Tex. Crim. App. 1988); **Hambright v. State**, 289 S.E.2d 24, 25 (Ga. Ct. App. 1982); **Mendelvitz v. State**, 416 N.E.2d 1270, 1274 (Ind. Ct. App. 1981).

¶24. In **White v. State**, this Court affirmed the trial court's ruling that the defendant lacked standing to object to the search of a woman's room in which he had stayed the night. **White v. State**, 571 So. 2d 956, 958-59 (Miss. 1990). The **White** Court held accordingly even though the **White** Court regarded the search illegal from the standpoint that the woman did not entirely consent to the search. **Id.** at 958. **White** noted that the "automatic standing rule," previously recognized by the United States Supreme Court and by this Court, had since been expressly overruled. **Id.** at 959 (citing **United States v. Salvucci**, 448 U.S. 83, 95, 100 S. Ct. 2547, 65 L. Ed. 2d 619 (1980). The Court in **Salvucci** had overruled **Jones v. United States**, 362 U.S. 257, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960), finding that the automatic-standing rule recognized in **Jones** had "outlived its usefulness in this Court's Fourth Amendment

7

jurisprudence." *Salvucci*, 448 U.S. at 95. "The established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." *Alderman v. United States*, 394 U.S. 165, 171-72, 89 S. Ct. 961, 22 L. Ed. 2d 176 (1969).

¶25. As *White* explained, "[t]he automatic standing rule provided that one charged with a possessory crime automatically had standing to object to a search which tended to establish guilt of possession of the prohibited items." *White*, 571 So. 2d at 959 (citing *Jones*, 362 U.S. 257). Because *Salvucci* expressly overruled *Jones*, *White* held that it would follow *Salvucci* and thus overruled any prior Mississippi case law to the contrary. *White*, 571 So. 2d at 959 ("federal law controls any application of the fourth amendment of the Constitution of the United States").[1]

¶26. Here, the State argued at the suppression hearing that Sills did not have standing to object to the search of the F-350, claiming that, since Sills was in a stolen vehicle, "he must

---

[1] *White* also opined:

> We do not hold that an overnight guest will never possess a reasonable expectation of privacy in a residence. The defendant, in the instant case, was an overnight guest who failed to prove that he had a reasonable expectation of privacy in Ms. Quarles['s] apartment. "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."

*White*, 571 So. 2d at 959 n.2 (quoting *Rakas v. Illinois*, 439 U.S. 128, 132 n. 1, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978)).

establish his own Fourth Amendment Right was violated." In response, Sills attempted to argue what essentially was the automatic-standing rule, claiming that because he was being charged with illegal possession of items seized, he should have the right to challenge the search. The trial court commented that it did not think Sills's argument was a correct statement of law. In its order, however, the trial court made no mention of standing and ruled that the search constituted a valid inventory search.

¶27. "In reviewing the denial of a motion to suppress, we must determine whether the trial court's findings, considering the totality of the circumstances, are supported by substantial credible evidence." *Delker v. State*, 50 So. 3d 300, 303 (Miss. 2010) (internal quotation mark omitted) (quoting *Moore v. State*, 933 So. 2d 910, 914 (Miss. 2006) (standard of review for denial of a motion to suppress)). Further, we will affirm the denial of a motion to suppress if we find that the trial court's ruling reaches the right result, but for the wrong reason. *Delker*, 50 So. 3d at 306.

¶28. As the State points out, *Gant* addressed the incident-to-arrest exception to a warrantless search; it did not address the inventory-search exception. *Gant*, 556 U.S. at 351 (acknowledging that a vehicle search may still be allowed if it is shown that another warrant exception applies).

¶29. This Court has held that "it is permissible for officers to conduct an inventory search of the vehicle when the circumstances require it to be impounded by the officers, regardless of the reason for the necessary impoundment." *Black v. State*, 418 So. 2d 819, 821 (Miss.

9

1982). This "is for the protection of both the vehicle owner and the impounding officers." *Id.* (citing *Florence v. State*, 397 So. 2d 1105 (Miss. 1981)). This is an administrative task, that "must be conducted pursuant to standard, routine police procedures." *Mitchell v. State*, 792 So. 2d 192, 206 (Miss. 2001) (citing *South Dakota v. Opperman*, 428 U.S. 364, 375, 96 S. Ct. 3092, 49 L. Ed. 2d 1000 (1976)). "The policy or practice governing inventory searches should be designed to produce an inventory"; it must not be used as "a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4, 110 S. Ct. 1632, 109 L. Ed. 2d 1 (1990). An officer's testimony about the existence of such policy ordinarily will be sufficient. *United States v. Motten*, 452 Fed. App'x 502, 504 (5th Cir. 2011) (citing *United States v. Andrews*, 22 F.3d 1328, 1334-35 (5th Cir. 1994)).

¶30. Officer Gaines testified at the suppression hearing that it is standard procedure for the police department to do an inventory search of a vehicle before it is impounded. Because the F-350 had been reported stolen and because the owner of the vehicle was not there to move it, officers conducted an inventory search of the truck. During the search, Officer Gaines found a substance between the driver's seat and the console that he believed was methamphetamine. He also found a pipe he believed was used to smoke methamphetamine. Officers conducted a field test on the substance, which tested positive for methamphetamine. Officer Gaines said that while it was the department's policy and procedure to use an inventory sheet to list the items found, he did not recall using an inventory sheet in this

10

instance. Officer Gaines stated, however, that he documented in his report what he recovered from the vehicle.

¶31.    Even assuming, *arguendo*, that the Starkville police had failed to comply with the department's policy and procedure to use an inventory sheet to list the items found in the vehicle, we need not decide in this instance whether such a failure would invalidate an otherwise valid inventory search.[2]   Irrespective of whether Starkville police conducted a valid inventory search or not, Sills still had to establish that he had a legitimate expectation of privacy in the reportedly-stolen vehicle that was searched.  Sills failed to do so.  Defense counsel simply posited to the trial court an iteration of the automatic-standing rule, which Mississippi no longer recognizes.  *White*, 571 So. 2d at 959.  Accordingly, we find that this issue is without merit and that the trial court properly denied Sills's motion to suppress.

## II.    The State failed to prove constructive possession.

¶32.    Sills claims that the State failed to demonstrate that he ever touched the methamphetamine found in the truck or that he ever exercised dominion or control over it.

---

[2]   We note, however, that the United States Court of Appeals for the Fifth Circuit Court  has held that failure to complete inventory forms does not necessarily invalidate an otherwise valid inventory search.  *United States v. Loaiza-Marin*, 832 F.2d 867, 869 (5th Cir. 1987); *see also United States v. Trullo*, 790 F.2d 205, 206 (1st Cir. 1986) ("We will not hold the officer's failure, technically, to follow the inventory form procedures for valuables meant it was not an inventory search."); *United States v. Mayfield*, 161 F.3d 1143, 1145 (8th Cir. 1998) ("Compliance with procedures merely tends to ensure the intrusion is limited to carrying out the government's caretaking function.  This does not mean that inventory searches are always unreasonable when standard procedures are not followed, however.").

He argues that at the time of the stop, no one mentioned to him that suspected methamphetamine was discovered. Sills further claims that the F-350 was a crew truck that he rarely drove. Sills contends that *Naylor v. State*, 730 So. 2d 561, 566 (Miss. 1998) controls the outcome here.

¶33. Sills points out that in *Naylor*, this Court reversed and rendered a conviction for possession of cocaine with intent to distribute because the State had failed to prove that the defendant constructively possessed the cocaine at issue. *Id.* at 566-67. The *Naylor* Court found that the only evidence linking the defendant to the cocaine was the defendant's close proximity to the cocaine when he was found in the bathroom with his codefendant who was attempting to flush the cocaine down the toilet. *Id.* at 566.

¶34. As this Court has held, "[t]o support a conviction for possession of a controlled substance, 'there must be sufficient facts to warrant a finding that [the] defendant was aware of the presence and character of the particular substance and was intentionally and consciously in possession of it.'" *Glidden v. State*, 74 So. 3d 342, 345 (Miss. 2011) (alteration in original) (quoting *McClellan v. State*, 34 So. 3d 548, 553 (Miss. 2010)). "Possession . . . may be actual or constructive . . . ." *Terry v. State*, 324 So. 3d 753, 755 (Miss. 2021) (internal quotation marks omitted) (quoting *Haynes v. State*, 250 So. 3d 1241, 1244 (Miss. 2018)).

¶35. With actual possession, "the drug is actually found on the defendant's person (*i.e.*, in his hands, mouth, pockets, etc.) . . . ." *Glidden*, 74 So. 3d at 348 (quoting *Hudson v. State*,

12

30 So. 3d 1199, 1203-04 (Miss. 2010)). With constructive possession, "the drug is simply found 'near' the defendant's person in a place over which the defendant exercises dominion and control." *Id.* (quoting *Hudson*, 30 So. 3d at 1203-04). Thus, with constructive possession, the State has to prove the defendant "was aware of the [drug] and intentionally, *but not necessarily physically*," in possession of it. *Id.* (quoting *Hudson*, 30 So. 3d at 1203-04).

¶36.   This Court has also said that "[w]hen contraband is found on the premises which [is] not owned by a defendant, mere physical proximity to the contraband does not, in itself, show constructive possession." *Kerns v. State*, 923 So. 2d 196, 200 (Miss. 2005) (internal quotation marks omitted) (quoting *Cunningham v. State*, 583 So. 2d 960, 962 (Miss. 1991)). Usually, in such situations, "the state must show additional incriminating circumstances to justify a finding of constructive possession." *Id.* (internal quotation marks omitted) (quoting *Fultz v. State*, 573 So. 2d 689, 690 (Miss. 1990)).

¶37.   Here, this Court must consider all of the evidence in the light most consistent with the jury's verdict. *Stringer v. State*, 557 So. 2d 796, 797 (Miss. 1990).[3] Based on our review

---

[3] *Stringer* reiterated that when a criminal defendant proceeds to offer evidence in his defense following the trial court denial of a motion for directed verdict after the state's case-in-chief, the defendant waives this assignment of error on appeal. *Stringer*, 557 So. 2d at 797. This does not mean that the defendant waives his "right to challenge the weight or sufficiency of the evidence to sustain the judgment against him." *Id.* (internal quotation mark omitted) (quoting *Clements v. Young*, 481 So. 2d 263, 268 (Miss. 1985)). Rather, "this Court considers the sufficiency of the evidence point on the basis of all the evidence offered." *Id.*

of the trial evidence, we find that ample evidence was presented to support the jury's guilty verdict.

¶38. While Sills did not own the truck, he was in possession of it from February 17 until the night of his arrest on February 19. According to Sills, he was alone in the truck for at least thirty-two hours from the time, as he claims, it took him to drive from West Point to Dallas and back to Mississippi. Sills claimed that the F-350 was kept spotless, and he never saw a pipe or any type of contraband in the truck. Sills also indicated in his testimony that he did not believe there was a pipe or methamphetamine inside the F-350 at the time he was pulled over by the Starkville police. And Sills denied ever making the statement to Officer Hernandez that he had been "smoking crystal meth all day."

¶39. It is clear that the jury believed the State's evidence that Sills had admitted to "smoking crystal meth all day." It is also clear that the jury believed that contrary to Sills's testimony, a pipe was in fact found inside the truck that Sills was driving, which could be used to smoke the crystal meth he purportedly told Officer Hernandez he had been smoking. Given this evidence, it was not unreasonable for the jury to infer that the substance discovered by the police was methamphetamine that, while not physically found on Sills's person, had belonged to Sills nonetheless.

¶40. The lack of evidence described in *Naylor* is not the case here. *Naylor*, 730 So. 2d at 566. Not only was Sills in close proximity to the methamphetamine found in the truck, Sills also was in close proximity to paraphernalia used to smoke methamphetamine. And Sills had

14

admitted smoking methamphetamine throughout the day before being pulled over by Starkville police. All of this evidence when taken together warrants the jury's finding that Sills was aware of the methamphetamine discovered in the F-350 and that he was intentionally in possession of it. Accordingly, we find that this issue is without merit.

### III. The State failed to prove the weight of the methamphetamine.

¶41. Sills claims that not all of the substances removed from the F-350 that the State alleged was methamphetamine were tested by the Columbus forensics lab.

¶42. This is true. According to Gilman, the State's expert in controlled-substance analysis, she received an evidence bag from the Starkville police that contained "over ten" pieces of "crystal-like" substance. Collectively, the bag's contents weighed 2.09 grams.

¶43. When asked by defense counsel if she tested each piece, Gilman said she did not test each piece; otherwise "you wouldn't have a substance left."

¶44. When asked if she could have taken a small piece off each one, Gilman said she could not remember if she could or could not because it had been more than six years before when she conducted the test.

¶45. Defense counsel then asked: "So, we only know that a portion of those items in [the bag] have a presence of methamphetamine? We don't know about all of them, do we?" Gilman replied: "I guess you can say that, yeah."

¶46. Defense counsel then asked Gilman, "If I told you they were retrieved from the floor of a vehicle, would that make any difference?" Gilman responded, "Not to me. No."

¶47. Defense counsel then asked, "Wouldn't you have to test each particular rock to know if that rock had methamphetamine in it?" Gilman responded, "Yes." Defense counsel then asked, "Okay. And you weren't able to test every single rock, were you?" Gilman responded, "No."

¶48. On redirect, Gilman testified that she does not always test every piece of substance in the submission bag submitted to the lab. She said this is standard practice, which is accepted in the scientific community.

¶49. Over defense counsel's objection, the State then asked, "Based on your experience and your expertise, looking at the other crystals or the other balls in the bag, did it appear to be the same stuff—substances? Did it appear to be the same substance as the substance you actually tested?" Gilman responded, "Yes, it appears that way."

¶50. The State points out that the Court of Appeals has held that "a forensic chemist is generally not required to test all of the suspected narcotic substance to opine that the recovered substance as a whole contains narcotics." *O'Kelly v. State*, 267 So. 3d 282, 290 (Miss. Ct. App. 2018) (internal quotation marks omitted) (quoting *Fay v. State*, 133 So. 3d 841, 844-45 (Miss. Ct. App. 2013), *cert. denied*, 133 So. 3d 818 (Miss. 2014) (table)), *cert. denied*, 267 So. 3d 279 (Miss. 2019) (table).

¶51. In *O'Kelly*, the defendant was convicted of drug trafficking, having been found in possession of more than forty dosage units of 25B-NBOMe (acid). *Id.* The State tested only eight of the approximately 425 perforated squares found in defendant's apartment and

16

determined that all eight contained 25B-NBOMe (acid). *Id.* The Court of Appeals affirmed. *Id.*

¶52. In *Fay*, the defendant had claimed that there was insufficient evidence to convict him of possession of 0.1 gram and two grams of methadone because the forensic chemist only tested one of several pill fragments from a bag found in the defendant's pocket. *Fay*, 133 So. 3d at 844. The Court of Appeals, relying on an Illinois case, held that "[r]andom testing is permissible when the seized samples are sufficiently homogeneous so that one may infer beyond a reasonable doubt that the untested samples contain the same substance as those that are conclusively tested." *Fay*, 133 So. 3d at 845 (quoting *People v. Adair*, 940 N.E.2d 292, 295 (Ill. App. Ct. 2010)). Because the pill fragments were all the same color and bore the same marking, the Court of Appeals concluded that "[b]ased on the relatively homogenous nature of the pill fragments," sufficient evidence supported the jury's conclusion that the defendant possessed between 0.1 grams and two grams of methadone. *Id.*

¶53. Here, Gilman testified, based on her experience and expertise, that the substances submitted to her were all the same substance and that the substances were the same as what she actually tested. What was submitted to Gilman was presented to the jury as evidence for its consideration. Based on Gilman's testimony and the evidence submitted, we find that the jury could reasonably infer beyond a reasonable doubt that the untested samples contained the same substance as those conclusively tested. Accordingly, we find this issue is without merit.

## CONCLUSION

¶54. Sills's conviction of possession of methamphetamine greater than two grams but less than ten grams is affirmed.

¶55. **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**