# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-00551-COA

**DERRICK WAYNE CHAVERS A/K/A DERRICK CHAVERS**　　　　　　　　**APPELLANT**

**v.**

**STATE OF MISSISSIPPI**　　　　　　　　　　　　　　　　**APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 02/21/2024 |
| TRIAL JUDGE: | HON. KATHY KING JACKSON |
| COURT FROM WHICH APPEALED: | GREENE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JOHN ANTHONY PIAZZA |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | ANGEL MYERS McILRATH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 11/04/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., WESTBROOKS AND McCARTY, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1.　Derrick Chavers drove a utility task vehicle (UTV) into a group of people who were leaving a party, killing two individuals and injuring a third.  Following a jury trial, Chavers was convicted of two counts of manslaughter and one count of aggravated assault.  On appeal, Chavers argues that the trial court erred by giving a voluntary intoxication jury instruction, that he was entitled to a new trial after the jury was mistakenly given written jury instructions that had been "refused" or "withdrawn," and that the evidence was insufficient to support his convictions.  We find no reversible error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. In December 2020, Chavers drove his UTV into a crowd of people who were leaving a party in Leakesville, striking Wesley Smith, Levi Lewis, and Cody Smith. Wesley and Levi died as a result of the injuries they sustained, and Cody was seriously injured. In July 2022, a Greene County grand jury indicted Chavers for two counts of culpable-negligence manslaughter and one count of aggravated assault.[1] The trial court granted Chavers's motion for a change of venue, and his trial was held in Jackson County.

¶3. Blake Fontenot testified that he hosted a party at his home in Leakesville on December 12, 2020. When Fontenot met Chavers at the party, Fontenot asked Chavers to leave because Chavers "was older" than most of the other guests, who were teenagers or in their twenties. Fontenot testified that Chavers arrived at the party on a UTV and was drinking alcohol. Later on, "50 or 60" people began fighting inside Fontenot's house, and he told everyone to leave. As the crowd exited the house, they began arguing again, and Fontenot walked toward the road to try to break them up. Suddenly, Chavers's UTV "came up the hill" and drove into the crowd. Fontenot estimated that the UTV was traveling between 60 and 65 miles per hour. "From the time [Fontenot saw] the headlights in the road to the time it topped the hill, nobody had time to get out of the way. It just happened that fast." The UTV struck Wesley first and then hit Cody and Levi. The UTV "slowed down a lot by hitting [them], and then it just rolled to a stop until it touched [Fontenot's] mailbox." Fontenot testified that Chavers was driving and that he threw "the keys out of the [UTV]" and then "rolled out." Chavers tried to tell Fontenot that Chavers's son, Brenton, had been driving the UTV.

---

[1] Chavers was also indicted for tampering with physical evidence; however, the court dismissed that count on the State's own motion at the close of the State's case-in-chief.

2

¶4.    Christian Havard attended the party and used her phone to video the altercation outside the house. As Havard was videoing the altercation, Chavers's UTV "came out of nowhere and ran [the victims] over." Havard's video was entered into evidence and played for the jury at trial. Havard told officers that she estimated that the UTV was traveling between 20 and 30 miles per hour.

¶5.    Several other guests at the party testified regarding the collision and the events leading up to it. One witness testified that she saw Chavers with "a beer in his hand, but [she] did not see him take a sip." Another witness testified that Chavers was drinking at the party. Additional witnesses identified Chavers as the driver of the UTV.

¶6.    Cody Smith testified that when he arrived at the party, he saw a UTV with "two 30 packs of Natural Light and a half-drunken bottle of Southern Comfort" inside. After fighting broke out inside the house, Cody and Wesley decided to leave, and "the majority of the house followed [them] outside." As they were trying to cross the street to their vehicles, Cody saw headlights and heard a UTV just before he was struck. Cody sustained a broken wrist and fingers, a concussion, herniated discs, injuries to his head, and a torn ACL. Cody testified that he still "wake[s] up with pain every day."

¶7.    Leah Black testified that during the party, her friend Ashley Clark said she was going for a ride on a UTV. Black asked Clark if she could go too. Chavers drove the UTV, but Black did not know him at the time. Black sat in the back of the UTV without a seatbelt, and Clark was in the passenger seat. Black testified that while in the UTV, Chavers "called somebody and [asked] why ain't this thing going over 35 miles an hour. And he [said] oh,

3

because it's not in sports mode." Black testified that Chavers then "put [the UTV] in sports mode." Black did not know how fast the UTV was traveling, but she estimated that its speed "double[d]" after Chavers put it in "sports mode." Black testified that she nearly "fell off" and "had to catch [her]self" after Chavers "hit the gas." Although Black "grew up riding," she was still "a little nervous" riding with Chavers because she "almost f[e]ll off a few times." Black was still on the UTV when Chavers struck Wesley, Cody, and Levi. Black testified that Chavers applied the brakes "a few seconds" after she first saw the group of people leaving the party.

¶8. Greene County Deputy Sheriff Kenneth Braswell was dispatched to the scene, which he described as "chaotic." After Wesley, Levi, Cody, and Ashley were transported to the hospital, Braswell spoke to Chavers and Chavers's son, Brenton. Brenton was fifteen years old at the time. Both Chavers and Brenton told Braswell that *Brenton* was driving the UTV and that Chavers was in the passenger seat. They told Braswell that they drove away from the party in the UTV, later turned around to return, and were traveling "between 45 and 50 miles an hour at the time of impact." Braswell observed a case of Natural Light beer in the back of the UTV. Braswell put Chavers and Brenton in his patrol vehicle "[t]o separate them from the rest of the crowd." Braswell took Chavers and Brenton to the hospital to obtain a blood sample from Brenton. Chavers consented to Brenton's blood draw. Because the families of the injured victims were at the hospital and "irate and very agitated," Braswell brought Chavers and Brenton into the hospital through a side door. Neither Chavers nor Brenton requested medical attention. When Braswell initially completed the accident report,

4

he listed Brenton as the driver, but about a month after the report was completed, he corrected the report to show that Chavers was the driver.

¶9.   Greene County Deputy Sheriff Joe Hinton was also called to the scene.  He also testified that Chavers and Brenton both said that Brenton had been driving the UTV at the time of the accident.  Hinton testified that "Chavers appeared to have a hard time keeping his balance," and Hinton "noticed a strong odor of what appeared to be an intoxicating beverage coming from [Chavers's] breath."

¶10.   Greene County Chief Deputy Sheriff Brad Warrick searched the UTV.  Warrick testified that the front cup holder had a "glass jar in it" with an unidentified pink liquid, and there was "a beer box on the back" with one unopened can and one empty can.

¶11.   Cheyenne Daughdrill testified for the defense.  She was about twenty feet from the collision when it occurred.  She "saw headlights coming around the curve and up the hill" and testified that the UTV "was going pretty fast."  Chavers was driving, and Daughdrill saw him hit his head on the steering wheel during the accident and then fall out of the UTV.

¶12.   Kage Eubanks testified that on the night of the accident, he and Brenton had attended a church party and planned to meet Chavers at a hunting camp.  On their way to the hunting camp, they saw that Chavers had stopped his UTV to talk to someone in Fontenot's front yard.  Eubanks and Brenton stopped and joined the party inside the house.  Clark told them she had never ridden on a UTV, so Eubanks and Brenton offered her a ride.  Eubanks stated that Clark and Black got in the UTV with Chavers, and he and Brenton followed behind them in Eubanks's Jeep.  Eubanks testified that they were traveling around 25 miles per hour.

5

When they returned to the party, there were "people all over the road" that had not been there when they left a few minutes earlier. When Eubanks went to check on Chavers after the collision, "[h]e was kind of dazed and wasn't all the way there." Then, "somebody [began] making threats against [Chavers]," and Brenton "stepped in front of them and said that he was driving." Eubanks opined that Brenton did this "[t]o save his dad."

¶13. Brenton testified that he and Eubanks sat in the UTV at the party "to watch it and make sure nobody messed with it." Brenton stated that he did not see a case of Natural Light in the UTV and that neither he nor Chavers drank Natural Light. Brenton testified that he consumed alcohol at the party, but Chavers did not. Brenton stated that when Chavers took Clark and Black for a ride in the UTV, he and Eubanks followed behind. Brenton stated that after the wreck, Chavers was unconscious for "about a minute" before he helped him up. Brenton testified that Chavers was "out of his mind" and "zoned out" after the wreck. According to Brenton, "there was a bunch of screaming and hollering," and someone "aggressively" approached them wanting to know who had been driving the UTV. At that point, Brenton said he had been driving. Braswell took Brenton and Chavers to the hospital and obtained a blood sample from Brenton. Chavers's father, Lance Chavers, picked up the two of them at the police station.

¶14. Lance testified that the next morning, Chavers stated that he, not Brenton, had been driving the UTV. Lance then called a lawyer to have the report corrected.

¶15. Jason Walton testified for the defense as an expert in accident reconstruction. A video showing the scene of the wreck and direction of travel of the UTV was admitted into

evidence and shown to the jury. Walton opined that there was no way to calculate the speed at which the vehicle was traveling based on the video of the wreck. Walton testified that "the majority of drivers between the age of 18 and 65 . . . perceive and react to a hazard in 1.6 seconds," with 0.8 seconds to process the hazard and another 0.8 seconds to "decide what to do." He opined that a driver must "have sufficient time and distance in order to avoid a collision." However, the court sustained the State's objection when Walton was asked whether he believed this crash was avoidable. Walton opined that if the UTV was traveling 25 miles per hour, there would have been 0.3 seconds less than the normal reaction time to apply the brakes. He testified that "because [Chavers] did hit the brakes, that means perception and reaction had to have occurred; he identified something as a hazard and made the conscious decision to apply brakes."

¶16. At the close of the evidence, the trial court denied the defense's motion for a directed verdict. After the court read the instructions to the jury and the attorneys presented closing arguments, the jury retired to deliberate at 2:43 p.m. Around 3:20 p.m., the jury sent a note to the court that read, "Refused or withdraw[n]? Which do we follow?" At that point, the court and the parties realized that, by mistake, the jury had been given the written jury instructions that had been "refused" or "withdrawn." The court then "immediately substituted the correct" instructions to the jury. At 4:45 p.m., the jury informed the court that it had reached a verdict. The jury found Chavers guilty of all counts.

¶17. After the verdict was read, the court asked the jury if the "verdict [was] in any way based on the first set of instructions[,]" and the jurors responded "No." One juror stated, "I

7

started reading them. . . . But then I was confused by them." The court asked if that was when the jury sent the note to the court, and the juror responded in the affirmative. The entire jury confirmed again that their verdict was not based on the first set of written instructions provided to them. The court asked whether either party had any questions for the jurors, and both the defense and the State declined.

¶18. The court sentenced Chavers to consecutive terms of twenty years in the custody of the Department of Corrections for the manslaughter counts and twenty years for aggravated assault to run concurrently with the manslaughter sentences. Chavers filed a motion for a new trial or judgment notwithstanding the verdict, which was denied, and a notice of appeal.

**ANALYSIS**

¶19. On appeal, Chavers argues (1) that the circuit court erred by giving a voluntary intoxication jury instruction; (2) that he was entitled to a new trial after the jury was mistakenly given the written jury instructions that had been "refused" or "withdrawn"; and (3) that the evidence was insufficient to support his convictions.

### I. Voluntary Intoxication Jury Instruction

¶20. Chavers argues that the circuit court erred in giving Jury Instruction S-6, a voluntary intoxication instruction, because intoxication was not an element of the charged offenses, the instruction was not supported by the law, and the instruction was misleading. In general, our standard of review for rulings on jury instructions is "abuse of discretion." *Newell v. State*, 49 So. 3d 66, 73 (¶20) (Miss. 2010). "The trial court enjoys considerable discretion regarding the form and substance of jury instructions." *Higgins v. State*, 725 So. 2d 220, 223

8

(¶15) (Miss. 1998). "[T]he instructions actually given must be read as a whole. When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found. There is no error if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law." *Newell*, 49 So. 3d at 73-74 (¶20) (quoting *Rubenstein v. State*, 941 So. 2d 735, 785 (¶224) (Miss. 2006)).

¶21.    Here, instruction S-6 stated:

> The Court instructs the Jury that if a defendant, when sober, is capable of distinguishing between right and wrong, and the defendant voluntarily deprives himself of the ability to distinguish between right and wrong by reason of becoming intoxicated and commits an offense while in that condition, he is criminally responsible for such acts.

At trial, Chavers objected to S-6, arguing that there was "no caselaw . . . to support" it and that it "would be confusing to the jury." The State argued that *Thornton v. State*, 841 So. 2d 170 (Miss. Ct. App. 2003), supported the instruction and that the jury "need[ed] to understand that . . . [Chavers] can't argue the fact that he was drinking could take away his intent to do these acts that were done." The court gave instruction S-6. At Chavers's request, the court also gave jury instruction D-4-A, which stated:

> The Court instructs the jury that the operation of a motor vehicle while under the influence of intoxicants may be a factor indicating criminally culpable negligence if the influence of intoxicants proximately contributed both to the negligence of . . . Chavers and to the resulting death. The influence of intoxicants must have created an abnormal mental and physical condition in . . . Chavers which deprived him of the clearness of intellect and control of himself in which he would not otherwise process [sic[2]].

---

[2] The last sentence of the instruction should have omitted "not" and should have stated "possess" instead of "process." *See Cutshall v. State*, 191 Miss. 764, 772, 4 So. 2d 289, 292 (1941). However, the transcript shows that the court orally instructed the jury in accordance with the written instruction (as quoted above).

¶22. Voluntary intoxication is not a defense to culpable-negligence manslaughter or aggravated assault since they are both general-intent crimes. *Shaw v. State*, 139 So. 3d 79, 94 (¶58) (Miss. Ct. App. 2013) (Carlton, J., specially concurring). "The rule is that if a defendant, when sober, is capable of distinguishing between right and wrong, and the defendant voluntarily deprives himself of the ability to distinguish between right and wrong by reason of becoming intoxicated and commits an offense while in that condition, he is criminally responsible for such acts." *Mills v. State*, 376 So. 3d 1215, 1220 (¶19) (Miss. 2023) (brackets and quotation marks omitted).

¶23. Instruction S-6 tracks the language of *Mills* and other cases and, thus, correctly states the law regarding voluntary intoxication. Nonetheless, Chavers argues that it is "confusing and [could] be understood by any reasonable juror to find that if [Chavers] was intoxicated, then they must find him guilty." He further argues that the instruction is flawed because it refers to "an offense" rather than to the specific crimes charged in this case.

¶24. This argument is without merit. Instruction S-6 correctly states the law regarding voluntary intoxication. In addition, the jury was separately instructed on the essential elements of each count of the indictment, and "the instructions . . . must be read as a whole." *Newell*, 49 So. 3d. at 73 (¶20) (quoting *Rubenstein*, 941 So. 2d at 785 (¶224)). Read as a whole, the jury instructions required the jury to find that Chavers committed each essential element of each offense and further instructed the jury that if Chavers committed "an offense" while voluntarily intoxicated, then his intoxication was no defense. Because the instructions as a whole fairly announced the applicable law, the trial court did not abuse its

discretion by giving instruction S-6. *Id.* Moreover, by giving instruction S-4-A at Chavers's request, the trial court made clear that the jury could not convict Chavers solely because they found that he was intoxicated at the time of the accident.

¶25. In addition, the evidence at trial warranted the giving of instruction S-6. There was conflicting testimony about whether Chavers was drinking or intoxicated prior to the collision, so there was a factual basis for the instruction. Accordingly, the trial court did not abuse its discretion by giving the instruction.

## II. Refused and Withdrawn Jury Instructions

¶26. Chavers next argues that he is entitled to a new trial because the wrong written instructions were accidentally submitted to the jury. As discussed above, at the outset of the jury's deliberations, the jury was accidentally given the wrong instructions. Specifically, the jury was given the written instructions marked "refused" and "withdrawn" rather than the "given" instructions that the court had just read to them on the record. The court and the attorneys were seemingly unaware of the mistake until the jurors sent out a note asking if they should follow the refused or withdrawn instructions. The court immediately "substituted the correct" instructions, and the jury continued deliberating. After the jurors returned their verdict, the court questioned them regarding the issue and whether it had any impact on their verdict. The jurors stated that their verdict was not based on the first set of instructions. Further, only one juror stated that she had "started reading them" and was "confused," so the jury then sent out the note. When the issue was addressed immediately after the verdict, the court asked whether either party had any questions for the jury, and both

11

the defense and the State declined.  In addition, Chavers did not move for a mistrial prior to or following the jury's verdict.  He raised the issue for the first time in his post-trial motion for a new trial.

¶27.    As an initial matter, Chavers waived this issue by failing to move for a mistrial prior to the verdict.  As the Mississippi Supreme Court has stated,

> It is now well settled that when anything transpires during the trial that would tend to prejudice the rights of defendant, he cannot wait and take his chances with the jury on a favorable verdict and then obtain a reversal of the cause in this Court because of such error, but he must ask the trial court for a mistrial upon the happening of such occurrence when the same is of such nature as would entitle him to a mistrial.

*Taconi v. State*, 912 So. 2d 154, 157 (¶18) (Miss. Ct. App. 2005) (quoting *Blackwell v. State*, 44 So. 2d 409, 410 (Miss. 1950)).  By "tak[ing] his chances with the jury on a favorable verdict" and not "ask[ing] the trial court for a mistrial," Chavers waived the issue on appeal. However, we also conclude that the issue is without merit.

¶28.    Chavers's argument relies on the Mississippi Supreme Court's decision in *Reynolds v. Allied Emergency Services PC*, 193 So. 3d 625 (Miss. 2016).  In *Reynolds*, a medical malpractice case, the trial court read the correct jury instructions to the jury, but the correct set of instructions was not submitted to the jury for use during deliberations.  *Id.* at 627-28 (¶5). Rather, the bailiff mistakenly provided the jury with a set of instructions that "consisted of only the defense proposed instructions, including instructions that had been refused [or withdrawn] during the charge conference" and a peremptory instruction that told the jury to find for the defendants.  *Id.* at 628, 631 (¶¶5, 16).  The jury returned a unanimous defense verdict, and the court dismissed the jury.  *Id.* at 628 (¶5).  The court did not discover that the

12

jury had received the wrong set of instructions until after the jury had been dismissed and all parties had left the courthouse. *Id.*

¶29.  On appeal, the Supreme Court reasoned that it was "difficult to imagine a scenario more prejudicial to a party than what [had] occurred." *Id.* at 631 (¶16).  The Court emphasized that the jury received only the "defendants' proffered instructions," including instructions that had been refused or withdrawn. *Id.*  Indeed, the very "first instruction [the jury] read" was a peremptory instruction that "told them to find for the defendants." *Id.*  In addition, "the bailiff—an extension of the court and trial judge—provided the instructions, which carrie[d] with it the imprimatur of authority." *Id.* (quotation marks omitted).  Under these circumstances, the Supreme Court held that the plaintiffs were entitled to a new trial because there was a "likelihood" that the mistakenly submitted defense instructions were "confusing and prejudicial." *Id.*

¶30.  *Reynolds* is materially distinguishable from the case at hand.  Here, the record shows that the mistake was corrected during the jury's deliberations.  The record shows that one juror was "confused" by the initial set of instructions, so the jury sent out a note, and the court immediately provided them with the correct set of instructions. The jury then continued deliberating *and returned a verdict based on the correct set of instructions*.  Finally, the jurors affirmed in court that their verdict was not based on the incorrect set of instructions initially provided to them.  This case is a far cry from *Reynolds*, where the mistake was *not* corrected, and the jury actually returned a verdict based on the wrong set of instructions—the defendants' proposed instructions, including a peremptory instruction.

13

¶31. Unlike *Reynolds*, the record does not establish a "likelihood" that Chavers was prejudiced by the trial court's initial mistake, which the court promptly corrected while the jury was in deliberation and waiting for the judge to respond to their note. The incorrect instructions were retrieved, and the jury was given the correct instructions and instructed to continue deliberating. "This Court presumes that jurors follow the instructions of the court. To presume otherwise would be to render the jury system inoperable." *Neal v. State*, 15 So. 3d 388, 402 (¶30) (Miss. 2009) (ellipsis and quotation marks omitted) (quoting *Moore v. State*, 787 So. 2d 1282, 1291 (¶30) (Miss. 2001)). While it was certainly error for the court to give the jurors the wrong set of jury instructions, the mistake was corrected during deliberations, and we presume that the jurors deliberated and returned their verdict in accordance with the correct set of jury instructions provided to them. Accordingly, Chavers is not entitled to a new trial.

### III. Sufficiency of the Evidence

¶32. Finally, Chavers argues that the evidence is insufficient to support his convictions for manslaughter and aggravated assault. Chavers insists that "this was just a tragic accident" and that he "was not operating his vehicle in a culpably negligent manner."

¶33. We review a challenge to the legal sufficiency of the evidence de novo. *Johnson v. State*, 904 So. 2d 162, 166 (¶7) (Miss. 2005). "[W]e view the evidence in the light most favorable to the State and decide if rational jurors could have found the State proved each element of the crime." *Lenoir v. State*, 222 So. 3d 273, 279 (¶25) (Miss. 2017). "We are not required to decide—*and in fact we must refrain from deciding*—whether *we think* the State

14

proved the elements. Rather, we must decide whether a reasonable juror could rationally say that the State did." *Id.* (citation omitted) (quoting *Poole v. State*, 46 So. 3d 290, 293-94 (¶20) (Miss. 2010)). We must affirm the conviction as long as there is sufficient evidence for a rational juror to find that the State proved all elements of the offense beyond a reasonable doubt. *Poole*, 46 So. 3d at 293-94 (¶20).

¶34.    The jury found Chavers guilty of culpable-negligence manslaughter for the killings of Wesley Smith and Levi Lewis. Mississippi Code Annotated section 97-3-47 (Rev. 2020) provides that the "killing of a human being, by the act, procurement, or culpable negligence of another, and without authority of law . . . shall be manslaughter." Culpable negligence is defined as "negligence of a degree so gross as to be tantamount to a wanton disregard, or utter indifference to, the safety of human life." *O'Kelly v. State*, 267 So. 3d 282, 291 (¶31) (Miss. Ct. App. 2018) (quoting *McCarty v. State*, 247 So. 3d 260, 269 (¶29) (Miss. 2017)). Thus, "[t]he only requirement is recklessness or a willful disregard for an unreasonable risk." *Shumpert v. State*, 935 So. 2d 962, 967 (¶14) (Miss. 2006).

¶35.    Evidence shows that Chavers was driving the UTV at a high rate of speed in the dark toward a residence where he knew a large group of people were gathered at a party. On appeal, Chavers argues that "[n]o one was in the street" when he drove away from the party and that he had "no reason . . . to expect or know people would be on the road when [he] returned" about eight minutes later. However, various witnesses testified that 50 to 100 guests or more were at the party, that guests were socializing outside the house, including in the front yard, and that cars were parked all along both sides of the road. The video played

for the jury at trial likewise shows cars parked along the road. Under these circumstances, it was easily foreseeable that guests might be in the road returning to their cars at any given time. There was also conflicting testimony about whether and how much Chavers had to drink before the wreck, and the evidence permits a reasonable inference that Chavers allowed his own son to take responsibility for the wreck so that Chavers could avoid submitting to a blood-alcohol test. Ultimately, there was sufficient evidence for a rational juror to find beyond a reasonable doubt that Chavers acted and drove with "negligence of a degree so gross as to be tantamount to a wanton disregard, or utter indifference to, the safety of human life," *O'Kelly*, 267 So. 3d at 291 (¶31)—with a "reckless[] or . . . willful disregard [of] an unreasonable risk." *Shumpert*, 935 So. 2d at 967 (¶14). In addition, a rational juror could find that Chavers's culpable negligence caused the death of Wesley Smith and Levi Lewis. Viewing such evidence in the light most favorable to the State, a rational jury could find Chavers guilty of culpable-negligence manslaughter beyond a reasonable doubt.

¶36. The jury also found Chavers guilty of the aggravated assault of Cody Smith. To do so, the jury was required to find beyond a reasonable doubt that Chavers caused serious bodily injury to Cody "purposely, knowingly *or recklessly under circumstances manifesting extreme indifference to the value of human life*." Miss. Code Ann. § 97-3-7(2)(a)(i) (Rev. 2020) (emphasis added). Chavers and the State agree that the standard for recklessness under the aggravated assault statute is the same as under the culpable-negligence manslaughter statute. *Kirk v. State*, 362 So. 3d 93, 97 (¶14) (Miss. Ct. App. 2023) ("Aggravated assault committed recklessly under circumstances manifesting extreme indifference to the value of

16

human life has been declared analogous to our definition of culpable negligence in homicide cases . . . ." (brackets and quotation marks omitted) (citing *Gray v. State*, 427 So. 2d 1363, 1367 (Miss. 1983))). Therefore, for the reasons discussed just above, there was also sufficient evidence for rational jurors to find beyond a reasonable doubt that Chavers was guilty of aggravated assault.

## CONCLUSION

¶37. The trial court did not abuse its discretion by giving the State's proposed voluntary intoxication jury instruction, Chavers is not entitled to a new trial due to the initial submission of incorrect written instructions to the jury, and the evidence is sufficient to sustain Chavers's convictions.

¶38. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. LAWRENCE, J., NOT PARTICIPATING.**